IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>LANDSOURCE COMMUNITIES DEVELOPMENT LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 08-11111 (KJC)<br>(Jointly Administered) |
| LANDSOURCE CREDITOR LITIGATION LIQUIDATING TRUST, BY AND THROUGH ITS LITIGATION TRUSTEE,<br><br>Plaintiff,<br><br>v.<br><br>LNR NWHL HOLDINGS, INC., LNR LAND PARTNERS SUB, LLC, AND LNR PROPERTY CORPORATION,<br><br>Defendant. | Adv. Proc. No. 10-_____ (KJC)<br><br><br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR AVOIDANCE AND RECOVERY
OF FRAUDULENT TRANSFERS AND ILLEGAL DIVIDENDS**

The LandSource Creditor Litigation Liquidating Trust (the "Trust"), by and through its

Litigation Trustee ("Plaintiff" or the "Trust"), and as assignee of the rights of the above-

---

[1] The Associated Debtors in these cases were: California Land Company; Friendswood Development Company, LLC; Kings Wood Development Company, L.C.; LandSource Communities Development LLC; LandSource Communities Development Sub LLC; LandSource Holding Company, LLC; Lennar Bressi Ranch Venture, LLC; Lennar Land Partners II; Lennar Mare Island, LLC; Lennar Moorpark, LLC; Lennar Stevenson Holdings, LLC.; LNR-Lennar Washington Square, LLC; LSC Associates, LLC; NWHL GP LLC; The Newhall Land and Farming Company (A California Limited Partnership); The Newhall Land and Farming Company; Southwest Communities Development LLC; Stevenson Ranch Venture LLC; Tournament Players Club at Valencia, LLC; Valencia Corporation; and Valencia Realty Company.

captioned Debtors ("Debtors" or "LandSource"), for its complaint for Avoidance and Recovery of Fraudulent Transfers, alleges as follows:

**The Bankruptcy Proceedings**

1. On June 8, 2008 (the "Petition Date"), the Debtors commenced their bankruptcy cases by filing voluntary petitions for relief under chapter 11 of title 11, United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court").

2. On July 20, 2009, the Bankruptcy Court entered its order (the "Confirmation Order") confirming the Second Amended Chapter 11 Joint Plans of Reorganization for LandSource Communities Development LLC and Each of Its Affiliated Debtors (the "Plan"). The Plan became effective on July 31, 2009 (the "Effective Date").

3. Pursuant to Article IX, section B of the confirmed Plan and the Confirmation Order, on the Effective Date, all avoidance actions were assigned, transferred and conveyed to the Trust along with all rights and authority to pursue and recover on all avoidance actions under the Bankruptcy Code.

4. Pursuant to the Plan and Confirmation Order, as of the Effective Date, KDW Restructuring & Liquidation Services LLC was appointed Litigation Trustee of the Trust.

5. Defendants LNR Property Corporation and LNR NWHL Holdings Inc., are both Delaware corporations. Defendant LNR Land Partners Sub. is a Delaware limited liability corporation. Collectively, these entities shall be referred to as "Defendants."

**Jurisdiction and Venue**

6. The Bankruptcy Court has jurisdiction over this matter under the Bankruptcy Code and pursuant to 28 U.S.C. § 157(a) and §1334(a) and Article XIV, section A of the Plan.

7. Venue in this district is proper pursuant to 28 U.S.C. § 1409(a).

8. This adversary proceeding is commenced pursuant to Rule 7001(1) of the Federal Rules of Bankruptcy Procedure and is a core proceeding under 28 U.S.C. §157(b).

**Lennar and LNR Form LandSource in July 2003**

9. LandSource Communities Development LLC, a Delaware limited liability company, was formed in July 2003 by Lennar Corporation[2] ("Lennar") and LNR Property Corporation[3] ("LNR") to make strategic acquisitions and act as a holding company for certain jointly-owned partnerships created by Lennar and LNR, the sole members of LandSource.

10. LNR is one of the nations' leading buyers of non-investment grade and unrated Commercial Mortgaged Backed Securities ("CMBS"). LNR helped create the CMBS market, and was one of its first players. In the 1990's LNR struck a deal to purchase the riskiest CMBS bonds in exchange for a contract to serve as the pool's manager and reaped profits when the securities started to decline. Since then, LNR's core business has involved distressed real estate securities and distressed commercial loans.

11. LNR operated as a division of Lennar until 2005, when LNR was taken private by Cerberus Capital Management, L.P., various entities controlled by Stuart Miller, the former Chairman of the Board of LNR, and members of LNR's senior management.

---

[2] Lennar Corporation shall refer to Lennar Corporation or any of its predecessors, subsidiaries and/or affiliates, including, but not limited to Lennar Land Partners Sub, Inc., Lennar Land Partners Sub II, Inc., and Lennar Homes of California.

[3] LNR Property Corporation shall refer to LNR Property Corporation or any of its predecessors, subsidiaries, and/or affiliates, including, but not limited to LNR CPI Cross Valley Plaza LLC, LNR CPI Entrada Office LLC, LNR CPI Plaza West Hills LLC, LNR CPI Valencia Town Center Office LLC, LNR CPI West Creek Apartments LLC, LNR CPI West Creek Retail LLC, LNR Gateway V LLC, LNR Land Partners Sub LLC, LNR NWHL Holdings, Inc., LNR Land Partners Sub II, Inc., LNR Mare Island, Inc., LNR 200 Washington, Inc., and LNR Union City, Inc. (collectively, the "LNR Entities"). LNR NWHL Holdings Inc. and LNR Land Partners Sub. are the LNR entities which directly owned a collective 16% interest in LandSource as of February 2007.

**Overview of Transactions Under the December 2006 Contribution Agreement**

12. On or about December 28, 2006, Lennar and LNR entered into a Contribution and Formation Agreement ("Contribution Agreement") with MW Housing Partners III L.P. ("MWHP"), under which MWHP would invest in LandSource by contributing a combination of cash and property valued at approximately $970 million, and MWHP would receive an interest in LandSource. Pursuant to the Contribution Agreement, the parties also agreed to use their best efforts to consummate a minimum of $1.30 billion in secured debt financing with Barclays Capital PLC ("Barclays"), the proceeds of which would be applied, by a new subsidiary created at the closing of the transaction (LandSource Holding Company, LLC, or "LandSource Holding"), to help fund payment of special distributions to LandSource Communities Development LLC, which, in turn, would distribute such amount to the existing members LNR and Lennar as a "Class A Special Distribution."[4]

13. As a result of these transactions under and in furtherance of the Contribution Agreement, Lennar and LNR each received approximately $700 million. The remaining Barclays Financing was used, in conjunction with the proceeds of the MWHP Cash Contribution, to pay off LandSource's existing debt in full.

**MWHP Becomes a Member of LandSource in February 2007**

14. MWHP is an investment venture consisting of MacFarlane Housing, LLC ("MacFarlane"), a wholly owned subsidiary of MacFarlane Partners, the California Public Employees' Retirement System ("CalPERS"), and Weyerhaeuser Realty Investors ("WRI").

---

[4] For purposes of this Complaint, "Special Class A Distribution" or "distributions" shall refer to and include the distribution of $80 million to LNR several days prior to closing, in addition to the $627,638,422 received by LNR as a "Class A Special Distribution" pursuant to the Contribution Agreement. Attached as Exhibit A is a statement of the distribution amounts received by LNR.

MWHP is 90% owned by CalPERS, with the remaining 10% split equally between MWHP's managers, MacFarlane and Weyerhaeuser.

15. In consideration of the $1.4 billion distribution, Lennar and LNR had their stock ownership diluted, and the parties executed a Limited Liability Company Agreement ("LLC Agreement") on or about February 27, 2007. Under this LLC Agreement, Lennar and LNR were designated as Class A Members, who would each own a 16% interest in LandSource. MWHP was designated as a Class B Member, and would own a 68% interest in LandSource. Prior to the transaction, Lennar and LNR were the sole members, each owning a 50% interest in LandSource.

16. After this transaction closed, MWHP owned 68% and Lennar and LNR each owned 16% of the member interests in LandSource Communities. LNR and Lennar were designated as Managing Members who would manage the day to day operations of LandSource and would be compensated for their services. Lennar and LNR retained equal control of LandSource's Executive Committee, as 50% of the seats were held by MWHP, and 50% of the seats were held by LNR and Lennar.

**Investors Organized by Barclays Provide up to $1.55 Billion in Financing to LandSource**

17. On or about February 27, 2007 LandSource successfully obtained a maximum of $1.55 billion in financing from a consortium of investors managed by Barclays Capital. The financing consisted of (a) a $200 million undrawn five-year Revolving Credit Facility maturing in February 2012, (b) a $1.06 billion six-year Term Loan B Facility maturing in February 2013 (collectively, the "First Lien Term Facility"), and (c) a $244 million seven-year Second Lien Term Facility maturing in February 2014 ("Second Lien Term Facility", or, in conjunction with the First Lien Term Facility, "Barclays Financing"). Barclays Capital served

as sole bookrunner for each of the facilities, and Barclays Capital PLC acted as administrative agent ("First Lien Agent" and "Second Lien Agent," respectively) for the credit facilities.

18. These First Lien Term Facility and Second Lien Term Facility obligations were secured by liens on substantially all of Debtors' personal and real property.

19. Upon information and belief, the December 2006 appraisals of LandSource's real property conducted by CB Richard Ellis, Inc. ("December 2006 Appraisals") which were used to secure the Barclays Financing overstated the value of LandSource's assets, and contained significant errors and omissions.

20. Under the First Lien Term Facility and Second Lien Term Facility, LandSource was required to comply with a "Borrowing Base Limitation," which generally required LandSource's total outstanding credit to be less than or equal to a percentage of the total value of its assets.

21. Upon information and belief, the willingness of the Barclays investors and MWHP to participate in this transaction was based, in part, on the near-term cash flow expected from Lennar and LNR's business plans to purchase the majority of LandSource's property over the next three years.

22. Specifically, LandSource's projected revenue and near-term cash flow at the time of the 2007 transaction was heavily dependent on Lennar and LNR following through with their business plans, which never occurred. Lennar's business plan to provide near-term cash flow to LandSource, in the form of purchase contracts, option agreements, and rights of first offer, were relied on to constitute over 70% of LandSource's revenue for the next three years. Meanwhile, LNR planned to acquire 100% of LandSource's planned commercial land sales for the next three years.

**LandSource was Insolvent and Should Not Have Incurred Additional Debt to Fund the Fraudulent Transfers**

23. Immediately prior to entering into the Contribution Agreement, LNR and Lennar, as the sole owners of LandSource, knew that LandSource was insolvent, was about to engage in a transaction for which the remaining assets of LandSource were unreasonably small, and/or believed or reasonably should have believed that LandSource would incur debts beyond its ability to pay as they became due and/or suspected that it would not be able to service its existing debt.

24. LandSource had approximately $78 million in cash on hand immediately prior to closing, a fraction of the $1.4 billion payout made to LNR and Lennar.

25. Upon information and belief, as sophisticated investors in distressed real estate, LandSource's sole owners LNR and Lennar knew or reasonably should have known that the December 2006 Appraisals overstated the value of LandSource's property, and as a result, LandSource's assets were grossly inflated in connection with the February 2007 recapitalization and payment of the $1.4 billion distributions.

26. Directly preceding the 2007 transaction, LandSource's payable debt was approximately $428 million. Thus, the additional $1.1 billion in debt taken on by LandSource to finance the 2007 transaction represents more than twice the amount of existing debt LandSource was obligated to repay before it entered into the Contribution Agreement. It would be difficult for anyone to believe, let alone sophisticated real estate investors like Lennar and LNR, that LandSource would be able to service the amount of additional debt it took on and at the same time make equity distributions to Lennar and LNR well exceeding the amount of that additional debt.

27. While the financial crisis did not peak until fall of 2007, signs of the economic downturn actually began much earlier, with a drop in U.S. real estate prices in mid-2006. While the parties were undoubtedly aware of the general decrease in real estate prices during the latter half of 2006, upon information and belief, through inflated appraisal values and false projections, MWHP and the consortium of Barclays investors were misled by LandSource to believe that LandSource's primary assets, the Newhall and Valencia properties, would withstand the general "softening" of the U.S. real estate market.

28. In 2007, the mortgage lending industry began to experience significant turmoil - related primarily to the sub-prime mortgage crisis - that resulted in a corresponding nationwide tightening of available credit for residential mortgages. LNR's core business centers around distressed real estate assets, and as one of the pioneers of this industry, LNR knew or should have anticipated this decline.

29. There can be no doubt that preceding the February 2007 transaction, LNR, a company specializing in the development, ownership, and management of commercial properties and land since 1969, and a pioneer of the CMBS market, knew that (a) housing and commercial real estate prices had begun to drop in mid-2006, (b) it would not be able to generate the anticipated cash flow for LandSource by following through with its business plan, and (c) LandSource would not be able to service its debt.

30. Indeed, according to LNR's affiliate Lennar in a January 2, 2007 press release issued mere weeks before the Contribution Agreement was executed, LandSource experienced materially lower gross margins on home sales during the quarter and year ending with

November 30, 2006, compared to the same period in the previous year, as a result of deteriorating market conditions in the homebuilding industry.[5]

31. Stuart Miller, President and Chief Executive Officer of Lennar (and former Chairman of LNR), stated in the same press release that: "Market conditions continued to weaken throughout the fourth quarter and we have not yet seen tangible evidence of a market recovery. While we are hopeful that low interest rates, strong employment and a healthy economy will help stimulate a recovery in 2007, we have continued to focus on strengthening our balance sheet by delivering our backlog, selling inventory aggressively and renegotiating our land positions."

32. In addition, memoranda and other documents, prepared by the parties and servicers to the Contribution Agreement explicitly acknowledge the weakened real estate market afflicting the United States around and preceding the execution of the Contribution Agreement.

33. Contrary to the realities of the steep decline in the housing market, LandSource painted a fraudulent picture of its corporate health in order to induce an equity payout to Lennar and LNR under the guise of a recapitalization of the company. Instead of using the 2007 equity infusion to strengthen LandSource's balance sheet, LandSource took on additional debt of at least $1.35 billion to finance "special" distributions of over $1.4 billion dollars to Lennar and LNR.

34. While it was already insolvent at the time of the February 2007 transaction, following the transaction, LandSource's financial condition quickly fell into further decline. As land values plummeted shortly after the February 2007 transaction, Lennar and LNR

---

[5] Attached as Exhibit B is a copy of the January 2, 2007 press release.

decided not to complete their projected acquisitions, and walked away from the option agreements and purchase contracts upon which the Barclays investors and MWHP's decisions to invest in LandSource were based. The near-term cash flow expected in 2007 never materialized, and LandSource was unable to service its debt.

35. In January 2008, it was determined that LandSource was not in compliance with the Borrowing Base Limitation under both credit agreements with Barclays. LandSource's failure to comply with the Borrowing Base Limitation triggered an obligation under the First Lien Credit Agreement to make mandatory prepayments to the First Lien lenders, which LandSource was unable to accomplish.

36. LandSource and its creditors were able to negotiate a series of forbearance agreements, but upon expiration of those agreements, they were not able to agree upon a more comprehensive out-of-court restructuring plan.

37. On April 21, 2008, the First Lien Agent issued a Notice of Event of Default and Reservation of Rights related to LandSource's failure to make the mandatory prepayments associated with the breach of the Borrowing Base Limitation. Similarly, on April 28, 2008, the Second Lien Agent issued a Notice of Event of Default and Reservation of Rights related to LandSource's failure to comply with the First Lien Credit Agreement.

38. In sum, LNR, an insider and 50% owner of LandSource prior to the 2007 transaction, anticipated a collapse of the real estate markets and the impending demise and eventual bankruptcy of LandSource, and, knowing that LandSource was insolvent and would soon be unable to service its debt, orchestrated a transaction in February 2007 that would and did allow it and its co-owner Lennar to leverage their controlling ownership interests for "special" distributions of $700 million each to escape future losses and instead improperly

realize a hefty payday. Immediately following the February 2007 transaction, LandSource spiraled into further demise. Little more than a year after the transaction was consummated, LandSource filed for bankruptcy. With cash in hand, LNR left some 5,000 victims, including the California Public Employees' Retirement System, in the wake of LandSource's massive bankruptcy.

## First Claim for Relief
### (Fraudulent Transfers Under 11 U.S.C. § 548(a)(1)(A))

39. Plaintiff repeats and realleges the allegations contained in paragraphs 1 though 38 above, inclusive, as though fully set forth herein.

40. Plaintiff is informed and believes and thereon asserts that Debtors made a fraudulent transfer of approximately $700 million to LNR ("Fraudulent Transfer") with actual intent to hinder, delay, or defraud its creditors.

41. Plaintiff is informed and believes and thereon asserts that this Fraudulent Transfer was made in or about February 2007, within two years before the June 8, 2008 Petition Date.

42. Plaintiff is informed and believes and thereon asserts that LNR was a 50% owner and an insider of LandSource and that a close relationship existed between LandSource and LNR prior to the Fraudulent Transfer.

43. Plaintiff is informed and believes and thereon asserts that Debtors were insolvent at the time of the February 2007 Fraudulent Transfer or became insolvent shortly after the Fraudulent Transfer was made.

44. Plaintiff is informed and believes and thereon asserts that Debtors received less than a reasonably equivalent value in exchange for the Fraudulent Transfer.

45. Plaintiff is informed and believes and thereon asserts that Debtors concealed facts in connection with the Fraudulent Transfer.

46. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer left Debtors with inadequate cash for operating expenses and to service its debt, as evidenced by Debtors' financial condition following the Fraudulent Transfer.

47. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer was of substantially all Debtors' assets.

48. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer occurred shortly before or shortly after a substantial debt of at least $1.35 billion was incurred by Debtors.

49. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer resulted in the reduction of substantially all of Debtors' assets to cash.

50. Plaintiff is entitled to an order and judgment under 11 U.S.C. § 548 that the Fraudulent Transfer is avoided.

### Second Claim for Relief
**(Fraudulent Transfer Under 11 U.S.C. § 548(a)(1)(B))**

51. Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 50 inclusive, as though fully set forth herein.

52. Plaintiff is informed and believes and thereon asserts that Debtors made a Fraudulent Transfer of approximately $700 million to LNR.

53. Plaintiff is informed and believes and thereon asserts this Fraudulent Transfer was made in or about February 2007, within two years before the June 8, 2008 Petition Date.

54. Plaintiff is informed and believes and thereon asserts that Debtors received less than a reasonably equivalent value in exchange for the Fraudulent Transfer.

55. Plaintiff is informed and believes and thereon asserts that Debtors were insolvent on the date of the Fraudulent Transfer, and that Debtors remained insolvent as a result of the Fraudulent Transfer.

56. Plaintiff is informed and believes and thereon asserts that at the time of the Fraudulent Transfer, Debtors were engaged in a transaction, or were about to engage in a transaction, for which any property remaining with Debtors was an unreasonably small capital.

57. Plaintiff is informed and believes and thereon asserts that Debtors intended to incur, or believed that Debtors would incur, debts that would be beyond the their ability to pay as such debts matured.

58. Plaintiff is entitled to an order and judgment under 11 U.S.C. § 548 that the Fraudulent Transfer is avoided.

**Third Claim for Relief**
**(Fraudulent Transfer Under 11 U.S.C. § 550)**

59. Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 58 inclusive, as through fully set forth herein.

60. As alleged above, Plaintiff is entitled to avoid the Fraudulent Transfer under 11 U.S.C. § 548. As Defendants were the initial transferees of the Fraudulent Transfer, Plaintiff is entitled to recover for the estate the proceeds or value of the Fraudulent Transfer under 11 U.S.C. § 550. Alternatively, in the event that Defendants are determined to be immediate transferees of the Fraudulent Transfer, Plaintiff is informed and believes and thereon asserts that Defendants had knowledge that the Fraudulent Transfer was void, and may have lacked good faith in accepting the Fraudulent Transfer, entitling Plaintiff to recover the proceeds or value of the Fraudulent Transfer.

61. Plaintiff is entitled to an order and judgment under 11 U.S.C. § 550 that the proceeds or value of the Fraudulent Transfer is recovered for the benefit of the Trust.

**Fourth Claim for Relief**
**(Fraudulent Transfer Under 11 U.S.C. § 544(b) and 6 Del. C. § 1304(a)(1))**

62. Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 61 inclusive, as through fully set forth herein.

63. Plaintiff is informed and believes and thereon asserts that Debtors made a Fraudulent Transfer of approximately $700 million to LNR.

64. Plaintiff is informed and believes and thereon asserts that Debtors made the Fraudulent Transfer with actual intent to hinder, delay, or defraud their creditors.

65. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer was made to an insider.

66. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer was of substantially all Debtors' assets.

67. Plaintiff is informed and believes and thereon asserts that the value of the consideration received by Debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred.

68. Plaintiff is informed and believes and thereon asserts that Debtors were insolvent at the time of the Fraudulent Transfer and remained insolvent following the Fraudulent Transfer, as a result of the Fraudulent Transfer.

69. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer occurred shortly before or shortly after a substantial debt of at least $1.35 billion was incurred by Debtors.

70. Plaintiff is informed and believes and thereon asserts that Debtors concealed facts in connection with the Fraudulent Transfer.

71. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer left Debtors with inadequate cash for operating expenses and to service its debt, as evidenced by Debtors' financial condition following the Fraudulent Transfer.

72. Plaintiff is informed and believes and thereon asserts that the Fraudulent Transfer resulted in the reduction of substantially all of Debtors' assets to cash.

73. Pursuant to 11 U.S.C. § 544(b), the Trustee may avoid transfers of interest in the Debtor's property that would be avoidable by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and there exists at least one such creditor.

74. Plaintiff is entitled to an order and judgment under 11 U.S.C. § 550 and 6 Del. C. § 1307 that the Fraudulent Transfer is avoided.

**Fifth Claim for Relief**
**(Fraudulent Transfer Under 11 U.S.C. § 544(b) and 6 Del. C. § 1304(a)(2))**

75. Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 74 inclusive, as through fully set forth herein.

76. Plaintiff is informed and believes and thereon asserts that Debtors made a Fraudulent Transfer of approximately $700 million to LNR.

77. Plaintiff is informed and believes and thereon asserts that Debtors made the Fraudulent Transfer without receiving a reasonably equivalent value in exchange for the transfer or obligation.

78. Plaintiff is informed and believes and thereon asserts that Debtors were engaged or were about to engage in a business or a transaction for which the remaining assets of Debtors were unreasonably small in relation to the business or transaction.

79. Plaintiff is informed and believes and thereon asserts that Debtors intended to incur, or believed or reasonably should have believed that they would incur, debts beyond the their ability to pay as they became due.

80. Pursuant to 11 U.S.C. § 544(b), the Trustee may avoid transfers of interest in the Debtor's property that would be avoidable by a creditor holding an unsecured claim that is allowable under 11 U.S.C. § 502, and there exists at least one such creditor.

81. Plaintiff is entitled to an order and judgment under 11 U.S.C. § 550 and 6 Del. C. § 1307 that the transfer is avoided.

### Sixth Claim for Relief
**(Improper Distribution Under 6 Del. C. § 18-607)**

82. Plaintiff repeats, realleges and incorporates by reference the allegations contained in paragraphs 1 through 81 inclusive, as though fully set forth herein.

83. Plaintiff is informed and believes and thereon asserts that in February 2007, LandSource made illegal distributions to its member, LNR, of approximately $700 million. The distributions made by LandSource to LNR were solely for the benefit of LNR.

84. Plaintiff is informed and believes and thereon asserts that at the time of the distributions by LandSource to LNR for the benefit of LNR, the amount of LandSource's liabilities, other than liabilities to members on account of their limited liability company interests and liabilities for which the recourse of creditors was limited to specified property of LandSource, exceeded the fair value of the company's assets.

85. Plaintiff is informed and believes and thereon asserts that at the time of the distributions, LNR had actual knowledge that such payments constituted illegal distributions in violation of Delaware Code Title 6 § 18-607 and should not have been authorized.

86. Plaintiff was not on inquiry notice of the facts giving rise to this injury until at least June 8, 2008, the Petition Date.

87. Plaintiff has been damaged in the amount of approximately $700 million in illegal distributions to LNR, plus interest and costs. Accordingly, LNR is liable to Plaintiff for the illegal distributions, and Plaintiff is entitled to the entry of a judgment against LNR for receipt of illegal distributions in violation of Delaware Code Title 6 § 18-607, in the amount of the distributions, plus interest and costs.

88. Plaintiff demands a trial by jury on all issues so triable.

**WHEREFORE,** Plaintiff prays for judgment as follows:

For a determination that the Fraudulent Transfers are avoidable as fraudulent transfers under section 548 and 544 of the Bankruptcy Code, section 1304 of the Delaware UFTA, and section 18-607 of the Delaware Code and that Plaintiff is entitled to recover the transfers or their value under Section 550 of the Bankruptcy Code and section 1307 of the Delaware UFTA and section 18-607 of the Delaware Code;

For costs of suit incurred herein, including, without limitation, attorneys' fees;

For pre- and post-judgment interest on the judgment amount to the fullest extent allowed by applicable law; and

For such other and further relief as the Court may deem just and proper.

Respectfully Submitted,

Dated: June 8, 2010

**MESSANA ROSNER & STERN LLP**

/s/ Scott J. Leonhardt
Frederick B. Rosner (DE #3995)
Scott J. Leonhardt (DE #4885)
Brian L. Arban (DE #4511)
1000 N. West Street, Suite 1200
Wilmington, Delaware 19801

Telephone: (302) 295-5093
E-mail: sleonhardt@mrs-law.com

**KELLEY DRYE & WARREN LLP**

/s/ Michael C. Lynch
Michael C. Lynch
Marie E. Choi
101 Park Avenue
New York, New York 10178

Telephone: (212) 808-7800
Facsimile: (212) 808-7897
Email: mlynch@kelleydrye.com

Counsel for Plaintiff, the LandSource Creditor Litigation Liquidating Trust, by and through its Litigation Trustee